IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

                  Plaintiff,

         v.

SUNDIATA BROWN,

                  Defendant.

Case No. 10 CR 765-1

Hon. Harry D. Leinenweber

## MEMORANDUM OPINION AND ORDER

On March 1, 2012, this Court held a hearing on Defendant's Motion to Suppress his arrest, and the heroin and gun recovered in connection with that arrest. For the reasons stated herein, the Motion is **GRANTED.**

## I.  BACKGROUND

Both the Government and Defendant agree that, on September 18, 2009, Defendant Sundiata Brown ("Brown") was standing on the west side of King Drive, on the sidewalk, at approximately 5840 South King Drive. Brown testified he had parked his black Cadillac behind a Buick owned by a friend, Curtis Nowells ("Nowells"), who was also present. Nowells' friend Terrance Olawumi ("Olawumi"), Nowells' "alley mechanic" (unnamed at the hearing, but identified in a separate affidavit by Nowells as Ralph Clay), and an unnamed a male friend of the alley mechanic were also present. All were on the sidewalk.

Sometime shortly before noon, Chicago police tactical officer David Brown ("Brown") was driving his squad car north on King Drive. He was accompanied in the car by fellow tactical officers Erika Rodriguez ("Rodriguez") and James Franklin ("Franklin"). All were in plain clothes. Officer Brown spotted Defendant's group and pulled his unmarked squad car into the southbound lane of traffic, parking it roughly parallel to Nowells' car. There, the stories diverge, but both agree that shortly thereafter, Defendant Brown was charged with possession of heroin with intent to deliver (21 U.S.C. § 841(a)(1)), possession of a firearm in relation to a drug trafficking crime (18 U.S.C. § 924(c)(1)(A)) and possession of a firearm by a convicted felon (18 U.S.C. § 922(g)(1)).

## A. Witness Olawumi's Testimony

Olawumi testified that prior to that day, he had never met Sundiata Brown. When the three tactical officers arrived, an officer whom Olawumi described as a female Hispanic yelled "They're swallowing," apparently believing someone in the group was swallowing contraband to avoid the recovery of evidence.

One male tactical officer grabbed Olawumi and forced him to open his mouth; another male tactical officer grabbed Defendant Brown. Olawumi said he had not swallowed any drugs, he did not see Defendant Brown or anyone else swallow drugs, and he did not see anyone in the group drinking or with a bottle. He did not see Defendant Brown drop anything to the ground. He testified one of

- 2 -

the male tactical officers patted Defendant Brown down and yelled to the other officers that Defendant Brown had a gun. Olawumi then saw one of the male officers take the gun off of Defendant Brown.

At the hearing, Olawumi was shown a video exhibit, footage taken by a later-arriving police car. That video shows the filming police car pull up directly behind the tactical officers' unmarked squad car. It shows five men against the driver's side of the unmarked squad car. Olawumi identified the two men toward the rear of the unmarked car (closest to the camera) as the alley mechanic (Clay) and Clay's friend. Next to these two men were Nowells, then Olawumi, and finally Defendant Brown, positioned furthest from the camera.

Olawumi testified the video of the scene begins after the gun had been seized from Defendant Brown. He described the action on the video as follows: a plainclothes, dark-haired female officer that Olawumi identified as Rodriguez begins searching Brown. Olawumi's head is at first pointed toward the camera, but then turns to his left, toward Defendant Brown and Rodriguez, who then pulls something from Defendant Brown's jacket with her left hand and moves it up toward to Defendant Brown's face.

"I seen her pull a plastic bag from inside" his jacket, Olawumi testified, referring to his perception when he was at the scene. Olawumi also testified that, by his in-court perception of

the video tape, he heard someone on the audio track of the video say "he's got dope too."

On cross-examination, Olawumi testified that, at the scene, he saw what Rodriguez recovered, and that it was a bag with "little small bags" inside it.

After Rodriguez recovered the bag, Olawumi said he and Nowells were handcuffed and taken to the police station in the same marked police squad car, but were both later released in about an hour without charges.

### B. Defendant Brown's Testimony

Defendant Brown testified that when officers arrived, he heard Officer Rodriguez shout "They're swallowing." It was Officer Franklin, not Officer Brown, who first accosted him and found the gun, which Defendant Brown said was hidden in his waistband on the left side, covered by both a sweatshirt and his jacket.

Upon feeling the gun, Officer Franklin pressed him tightly down upon the hood of the car and asked him, "Nigger, you the police?" Officer Franklin retrieved the gun and handed it off to Officer Brown. Then the "transport vehicle" (another squad car) arrived and Officer Rodriguez announced she was going to "run through" the suspects again (search them again). It was at that point that Rodriguez searched Defendant Brown and found the drugs in his inside left jacket pocket, Defendant Brown said.

When Defendant Brown later learned that police had written in their report that Brown had been drinking from a bottle, he asked his attorney to test the bottle for DNA. He also asked his attorney to request police video recordings, and was able to retrieve it only because he correctly remembered the number atop the marked squad car as 313, which had been written incorrectly in police reports as 312.

Defendant Brown admitted on cross-examination that he was convicted in May 2011 for manufacturing heroin, in 2005 for possessing a gun as a felon, and in 2002 for manufacturing cocaine. Asked if he would do anything to avoid arrest, Brown replied, "I wouldn't say 'anything.'"

### C. Officer Brown's Testimony

Officer Brown testified he stopped his squad car that day because he saw Defendant Brown with his head tilted back, drinking from what appeared to be a raised, 40-ounce bottle of alcohol inside a brown paper bag whose edges were rolled halfway down the bottle. Although some details of the arrest Officer Brown could not remember, he was unambiguous in his identification of Defendant Brown as the one in the group drinking from the bottle.

Officer Brown testified he pulled over because he planned to arrest Defendant Brown for drinking on a public way, and that the presence of the bottle, coupled with the high gang activity in the area, was his sole reason for approaching Brown. He said he could

not tell if Defendant Brown's lips were actually in contact with the bottle. As he approached, someone in the group protested that they were merely drinking and weren't going to bother anybody.

Upon seeing the officers, Defendant Brown put down his bottle and began to walk away, with his back turned to Officer Brown. Officer Brown believed Defendant Brown was attempting to conceal something, and went after him to apprehend him. While walking away, Defendant Brown dropped a bag, later retrieved and determined to contain 79 individually packaged bags of heroin. Officer Brown testified he grabbed Defendant Brown from behind by the elbows, led him to his unmarked car and proceeded to pat him down. He discovered a blue steel Glock handgun in Defendant Brown's waistband. (The indictment further describes it as a loaded, .40 caliber semiautomatic Glock handgun.)

Officer Brown denied any of the three tactical officers made statements about anyone swallowing drugs. He did not remember if anyone besides Defendant Brown had been arrested and transported to the police station, but conceded police radio transmissions demonstrate he asked for transportation for three individuals. He stated if he had believed any suspects had swallowed drugs, he would have transported them to a hospital because of the potential for poisoning.

Officer Brown described the area where Defendant Brown was arrested as a high crime, high narcotics area. He testified it was

his own voice on police radio transmissions requesting backup. He did so because of the possibility that there could be more weapons. He also said his request for a "wagon" was to let the dispatchers know there were more suspects on the scene than police.

Shown the video of the scene, Officer Brown said he could not make out whether Officer Rodriguez was pulling something from Defendant Brown's jacket, nor could he hear what she (or someone else) said afterward. He said other officers can be seen searching the various defendants in order to ensure the officers' safety and to make sure nothing had been missed in prior searches. He said Officer Rodriguez never announced to him that she had found drugs, nor did he ever learn of any other drugs being found other than the ones he recovered. He placed the drugs in his back pocket shortly after they were dropped, and he recovered the bottle from which Defendant Brown had been drinking after "everything was over."

On cross-examination, Brown conceded that his report and prior testimony on the matter never mentioned a paper bag over the bottle, and that he had removed the bottle from the bag and left the bag at the scene. He acknowledged that he had never before mentioned that he hadn't seen Defendant Brown's lips on the bottle, and that, between prior accounts of the arrest and his testimony, he had learned from Officer Rodriguez that the bottle was being tested for DNA. He could not recall whether Drug Enforcement Agency agents had told him of the DNA testing or results. He

acknowledged having previously had a conversation with Defendant's counsel at the Bridgeview Courthouse, but did not recall the attorney mentioning the results of the DNA tests. He denied ever hearing before taking the stand at the suppression hearing that the bottle had also been tested for fingerprints.

Officer Brown acknowledged that prior reports had made no mention of a comment from any of the suspects about protests that they were "just drinking."

### D.  On-Scene Video and Audio

The Court carefully reviewed, in court and in chambers, the video from the squad car and its accompanying audio. The video displays a time stamp approximately every five seconds and the car arrives on the scene at roughly 11:49:14 a.m. At 11:50:03, the female officer, (undisputed to be Rodriguez) lifts Defendant Brown's left arm and pats and searches him, reaching into his jacket. Shortly after 11:50:12, she takes something from the jacket in her left hand and raises it, as if to show it to Defendant Brown. She then resumes patting and searching. At 11:50:26, she turns toward the sidewalk. At that moment, barely audible voices are heard, presumably the officers'. One of the words may have been "drugs" but because the audio is essentially unintelligible, the Court does not consider any of it in making its decision.

### E.  Stipulated Evidence

Defendant and Government stipulated that, if called to testify, a forensic scientist with the Illinois State Police would testify that she swabbed the liquor bottle that Officer Brown inventoried, and found a mixture of two people's DNA.  She then compared those two DNA profiles to a buccal swab from Sundiata Brown and concluded neither matched Brown's DNA profile.

Defendant and Government also stipulated that, if called to testify, another forensic scientist with the Illinois State Police would testify she examined the bottle for latent fingerprints and found one suitable for comparison.  It did not match Brown's fingerprints.  The scientist would testify that the absence of fingerprints may indicate a person did not hold the object, but that there are many reasons why a person who did hold an object might not leave a latent fingerprint suitable for comparison.

### II.  **LEGAL STANDARD**

Probable cause to arrest exists "if an officer reasonably believes, in light of facts known to her at the time, that a suspect had committed or was committing an offense." *United States v. Nelson*, 385 Fed.Appx. 566, 568 (7th Cir. 2010) (citing *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006).

A police officer, for officer safety, may stop and frisk a suspect with less than probable cause if he has a reasonable suspicion the defendant is armed.  *United States v. Robinson*, 537

F.3d 798, 801 (7th Cir. 2008) (citing *Terry v. Ohio*, 392 U.S. 1 (1968). A defendant's loitering in a high crime area is relevant to a determination of reasonable suspicion. *Robinson*, 537 F.3d at 801. Without more, however, a high-crime setting alone is insufficient to justify a *Terry* stop. *United States v. Thornton*, 197 F.3d 241, 248 (7th Cir. 1999).

Where there is no probable cause for a search or arrest, nor reasonable suspicion, a *Terry* stop violates the Fourth Amendment, and the exclusionary rule prohibits the use of evidence gained in such a manner, or evidence gained as "fruit of the poisonous tree" of that evidence. *Gentry v. Sevier*, 597 F.3d 838, 850 (7th Cir. 2010). If the ill-gotten evidence would have been inevitably discovered despite the illegal search or arrest, the exclusionary rule may be avoided if "the government can show that it was obtained as a result not of the illegality, but rather 'by means sufficiently distinguishable to be purged of the primary taint.'" *Id.*

### III.  <u>ANALYSIS</u>

The smoking gun in this case is not a gun at all, but a cold bottle. If the Court believed that Officer Brown had indeed spied Defendant Brown drinking from a bottle that alone would have given him probable cause to arrest Defendant Brown, and any search thereafter would have been legal pursuant to a valid arrest.

- 10 -

Even if Officer Brown had spied another member of the party drinking the alcohol, given the alleged furtive movements of Defendant Brown, the high-crime area, the high ratio of suspects than police, a *Terry* frisk of Defendant Brown for officer safety may well have been warranted. Whether or not the drugs were dropped or found inside the jacket, a *Terry* stop would have revealed the gun, and an arrest would have been proper at that point. Any drugs then found, again, would have been pursuant to a valid arrest and would have been admissible.

But Officer Brown's story is simply not credible in light of the crime lab's inability to find any DNA from Defendant Brown on the bottle. Moreover, Officer Brown was adamant that it was Defendant Brown he spied with the bottle. The implied explanation for this that Defendant Brown may not have had his mouth on the bottle, is just too implausible, given that Officer Brown contends he saw him drinking from it. Moreover, it is too convenient that the paper bag – which would explain the lack of fingerprints upon the bottle – was never mentioned before the suppression hearing and was supposedly separated from the bottle at the crime scene and left behind while the bottle was painstakingly recovered and inventoried.

The Court does not put a great deal of credibility in Defendant Brown's testimony. He is a convicted felon, currently imprisoned, whose convictions may be used under the rules of

evidence as proof of his untrustworthiness. Moreover, he has a lot to gain by lying, and his contention that he would not do "anything" to avoid conviction implies he would do some things to avoid it.

But the defense took great pains to show that it was Defendant Brown who sought out both the DNA testing and the video (by giving the correct police car number rather than the erroneous one on the police report). It is reasonable to infer that the Defendant would not have demanded DNA testing if he had actually been drinking from the bottle.

Additionally, Olawumi's testimony was not impeached by the Government and appears to be corroborated by the video. It shows Officer Rodriguez searched Defendant Brown and retrieved something from his coat pocket, briefly holding it up, as if displaying it to Defendant Brown. Olawumi, who was immediately next to Defendant Brown, and whose head was turned toward Defendant Brown and Officer Rodriguez, was in a position to see what was occurring and what was being retrieved. Olawumi identified the item retrieved as a bag with little bags inside it. This description is consistent with the drugs seized.

The Government pointed out that money was also retrieved, the inference being that perhaps it was the cash that had been pulled from the jacket. This might be a plausible explanation, if anyone had affirmatively testified money was what Rodriguez retrieved, or

if the Court believed Officer Brown. But Officer Brown, having been conclusively shown to be, at best, mistaken about the bottle, suffers from a lack of credibility. Olawumi's unimpeached testimony that drugs were produced by Rodriguez' search, combined with the video, makes his contention more credible.

The Court must conclude that Defendant Brown was not drinking on the public way, and that he did not drop the drugs as Officer Brown contends.

Officer Brown himself said that Defendant Brown's alleged drinking, coupled with the high gang presence in the area, was the sole reason for the stop. With the drinking and the dropping of drugs discredited, the gang presence in the area is all that is left to justify the *Terry* frisk or the more intrusive search of Defendant Brown's jacket. As *Robinson* makes clear that is not enough to justify a *Terry* stop, let alone a more intrusive search.

With the search unjustified, the Court is left to ruminate on a series of events whereby the discovery of the drugs and gun could have been proper, or at least not subject to exclusion. But where suppression is concerned, rumination and speculation are not a route to admissibility. Instead, as *Gentry* advises, it is the Government's burden to show the contraband would have (not could have) been discovered by another legal route.

This was not done. Officer Brown stuck by his story, thereby precluding any other possible routes to admissibility. The

Government also did not call the other two tactical officers, Rodriguez and Franklin, to testify as to other possible routes of admissibility. With the Government's one route to admissibility shown to be incredible, the Court cannot surmise its own path to admissibility; that burden lies with the Government, and it did not sustain its burden.

## IV.  CONCLUSION

The Court takes no pleasure in jettisoning the evidence against this repeat drug offender. But the Fourth Amendment and the exclusionary rule command it when the evidence is plain that the police exceeded their authority and obtained their evidence through an illegal search. Therefore, the Defendant's Motion to Quash the Arrest and Exclude the gun and the 79 bags of heroin is **GRANTED**.


**IT IS SO ORDERED.**


_____
        Harry D. Leinenweber, Judge
        United States District Court

**DATE:** 3/16/2012